943 F.2d 316
 CARMANA DESIGNS LTD., Appellant,
v.
NORTH AMERICAN VAN LINES INC., American Priority Express, Inc.
NORTH AMERICAN VAN LINES, INC., Cross-Claimant,
v.
AMERICAN PRIORITY EXPRESS, INC., Cross-Claimant.
 No. 91-1127.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6)
 July 8, 1991.
Decided Sept. 3, 1991.
 
 John J. Del Casale, M. Mark Mendel, Ltd., Philadelphia, Pa., for appellant.
 Jeffrey S. Adler, Oberymayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for appellee.
 Before STAPLETON, HUTCHINSON and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal from a grant of summary judgment requires us to determine whether a common carrier of goods in interstate commerce properly limited its liability to a shipper whose goods were destroyed by fire when the carrier's vehicle exploded on the highway. Prior to shipment, the customer, Carmana Designs, Ltd., signed two bills of lading with the carrier, North American Van Lines, Inc., (North American) comprising the agreement for the transport and delivery of Carmana Designs' goods, which were to be purchased for over $25,000. The United States Court for the District of Eastern Pennsylvania found that the bills limited North American's liability for the destruction of Carmana Designs' goods to $1.25 per pound of the actual weight of the shipment, stipulated by the parties after the accident as not more than 9,725 pounds. The district court, thus, entered judgment against North American for $12,156.25.
 
 
 2
 In this appeal, Carmana Designs contends that the court should have calculated Carmana's coverage based on either of the two net weight figures recorded on the two bills of lading by North American, 24,000 pounds or 34,000 pounds. Because the bills of lading and other undisputed evidence in this record shows that Carmana Designs reasonably believed it was fully covered, we conclude that, under federal law governing the interpretation of bills of lading, North American failed to limit effectively its liability for Carmana's shipment. We thus reverse.[1]
 
 I.
 
 3
 Carmen Vona and his wife own and operate Carmana Designs, a small company which designs, manufactures, and sells custom furniture and exhibits out of its sole place of business in Philadelphia, Pennsylvania. Carmana Designs has two employees who help to construct the furniture and make deliveries of small shipments by van.
 
 
 4
 On July 14, 1989, Carmana Designs entered into a contract with Macy's for the design, manufacture and delivery of custom display exhibits for two of Macy's Northern California stores. The displays consisted of fourteen lacquered, hollow, wooden pyramids, ranging in height from six to fourteen feet plus five other pieces for which Carmana Designs was to receive payment of $25,166. A tax of $1637.79 on these items and a delivery cost of $4,000 brought Macy's total bill to over $30,000. It appears that Carmana Designs' delivery charge of $4,000 was determined by the company which brokered the delivery arrangement, American Priority Express.
 
 
 5
 American Priority Express, a freight forwarder which obtains the services of carriers for its clients, brokered the contract between Carmana Designs and the defendant North American. The contract provided that North American, through its High Value Products Division, would timely deliver the exhibits to Macy's San Francisco and Santa Clara stores. According to his deposition, Vona believed he was to pay American Priority the $4,000 shipping charge, and American Priority in turn would pay the carrier North American $3,000. Vona never paid for this delivery, however, because on August 23, 1989, the truck carrying Carmana Designs' exhibits was involved in a one vehicle accident resulting in the total destruction of the exhibits. Because of the failure of the plaintiffs to timely deliver the exhibits, Macy's in California severely limited its future business with Carmana Designs.
 
 
 6
 Because the shipment had two different destinations, the transport and delivery contract between Carmana Designs and North American's High Value Products Division consisted of two bills of lading with sequential contract numbers. The bills of lading, bearing North American's name and logo, are standardized documents which allow the customer to declare a value for the shipment and thus fix the carrier's liability in case of loss. The customer could value it at $.60 a pound, $1.25 a pound, or state a lump sum value. Carmana Designs' officer Vona signed both bills of lading declaring North American's liability to be $1.25 a pound.
 
 
 7
 On the face of the bill of lading is a column for determining the weight and covered value of the shipped goods. That column is divided vertically into four sections. The bottom section, in bold red print, is reproduced in part below:
 
 
 8
 THE SHIPMENT WILL MOVE SUBJECT TO THE RULES AND CONDITIONS OF THE CARRIER'S TARIFF. SHIPPER HEREBY RELEASES THE ENTIRE SHIPMENT TO A VALUE NOT EXCEEDING:
 
 
 9
 $__________
 
 
 10
 (TO BE COMPLETED BY PERSON SIGNING BELOW)
 
 NOTICE:
 
 11
 THE SHIPPER SIGNING THIS CONTRACT MUST INSERT IN THE SPACE ABOVE IN HIS OWN HANDWRITING, EITHER HIS DECLARATION OF THE ACTUAL VALUE OF THE SHIPMENT, OR THE WORDS "60 per pound per article." OTHERWISE, THE SHIPMENT WILL BE DEEMED RELEASED TO A MAXIMUM VALUE OF $1.25 TIMES THE WEIGHT OF THE SHIPMENT IN POUNDS AND CHARGED PER TARIFF. IF THE SHIPPER DECLARES THE VALUE OF THE SHIPMENT AT ANY VALUE OTHER THAN $.60 PER POUND PER ARTICLE, THERE WILL BE A CHARGE ASSESSED FOR THE DECLARED VALUE. SEE ADVANCED CHARGE NOTE BELOW.
 
 
 12
 (Shipper)_______DATE___
 
 
 13
 Carmana Designs signed on the appropriate line and did not declare the shipment's actual value or limit North American's liability to $.60 a pound. Carmana Designs' agreement with North American, thus, shows that it chose to value the shipment of display exhibits at $1.25 per pound as the parties stipulated.
 
 
 14
 At the top of the valuation column in the first section are spaces in which to enter the gross, tare, and net weights of the truck and thus allow the computation of the weight of the shipment. Contrary to the bills' express requirement, however, these spaces were left blank. Directly underneath is the statement, "shipper certifies the total weight of this shipment to be: ___ pounds." On the first bill of lading, North American had typed the figure of 24,000 in the blank. On the other, the handwritten figure of 34,000 appears. Below the certified weight line is a signature line on which Vona signed both bills of lading. Underneath this column in the lower right corner of the bill, North American again recorded the net weight of 24,000 pounds on the first bill of lading.
 
 
 15
 According to Richard Panning, the manager of cargo claims for North American's High Value Products Division, the shipment was originally registered by American Priority with North American at 24,000 pounds. He also stated in his affidavit that the computer printed 24,000 pound figure is a standard designation used to indicate that the customer has reserved the entire truck for its shipment. According to Panning, no one from North American or American Priority discussed the purported meaning of the 24,000 pound figure with Vona or anyone else at Carmana Designs.
 
 
 16
 Vona testified that he read this part of the bill of lading when he signed both documents. He stated that he noticed that they had recorded the weight as 24,000 pounds, did a quick multiplication to arrive at the figure of $30,000, and felt that this covered the full value of his goods.
 
 
 17
 Panning did not know why the second bill of lading listed the certified weight as 34,000 pounds or who wrote it. Vona, however, testified that the 34,000 pound figure was filled in by the driver of the truck in Vona's presence. He did not know how the driver came up with 34,000 pounds and did not discuss it with him. After Carmana Designs' goods were destroyed in the fire caused by the motor vehicle accident, the shipper and North American stipulated that the actual weight of the shipment was no greater than 9,725 pounds.
 
 
 18
 On the reverse side of the bill of lading is another paragraph purporting to circumscribe the carrier's maximum liability. Printed in lower case black letters, in the middle of the page, this provision states that the carrier's maximum liability shall be the greater of two values: the lump sum value declared by the shipper or "1.25 times the actual weight (in pounds) of the shipment." This is the only mention of "actual" weight of the shipment in the bill of lading; the language on the front of the bill refers only to "weight" and "net weight." There is no place for a signature on the back of the bill. Although the face of the bill contains a highlighted section stating that it is subject to the terms printed on its reverse side, Vona testified that he did not read the back of the bill prior to releasing the shipment to North American and there is no evidence that it was ever brought to his attention.
 
 
 19
 On February 23, 1990, Carmana Designs filed this action in the Court of Common Pleas of Philadelphia County against North American and American Priority Express. Pursuant to a Motion for Removal filed by North American, the case was removed to the United States District Court for the Eastern District of Pennsylvania. American Priority never responded to any pleadings or participated in this case in any way. The district court denied Carmana Designs' motion for default judgment against American Priority based on a pro se letter sent to the court by American Priority.
 
 
 20
 On September 25, 1990, the case was tried before a panel of arbitrators. The panel awarded Carmana Designs $72,500. North American filed a timely appeal from that award. The district court, reviewing de novo the arbitrators' decision, reduced the shipper's award to $12,156.25. The parties have agreed that North American's liability to Carmana Designs is governed by federal law.
 
 II.
 
 21
 The Carmack Amendment to the Interstate Commerce Act imposes absolute liability upon carriers for "the actual loss or injury to property caused by" a carrier. 49 U.S.C. § 11707(a)(1). Under 49 U.S.C. §§ 11707 and 10730, carriers, however, are permitted to limit their liability through a written agreement with the customer or shipper which evidences "an absolute, deliberate and well-informed choice by the shipper." Bio-Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580, 1583 (11th Cir.1990) quoting Anton v. Greyhound Van Lines, Inc., 591 F.2d 103, 108 (1st Cir.1978). Permitting carriers to limit their liability is a carefully defined exception to the Carmack Amendment's general objective of imposing full liability for the loss of shipped goods; courts, thus, carefully scrutinize agreements purporting to limit such liability. Anton, 591 F.2d at 109.
 
 
 22
 Federal law requires that a carrier may limit its liability only if it takes the following four steps:
 
 
 23
 (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.
 
 
 24
 Norton v. Jim Phillips Horse Transp., 901 F.2d 821, 827 (10th Cir.1989) quoting Hughes v. United Van Lines, 829 F.2d 1407, 1415-16 (7th Cir.1987), cert. denied, 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988). The burden of establishing that these requirements have been met rests with the carrier. Acro Automation Systems v. Iscont Shipping Ltd., 706 F.Supp. 413, 416 (D.Md.1989); Flying Tiger Line v. Pinto Trucking Service, 517 F.Supp. 1108, 1112 (E.D.Pa.1981). Because this is an appeal from a grant of summary judgment, we must view the facts in the light most favorable to Carmana Designs, the non-moving party. Bechtel v. Robinson, 886 F.2d 644, 647 (3rd Cir.1989).
 
 
 25
 The dispute in this case involves the second and third requirements cited by the Norton court and others; specifically, whether or not North American, after giving Carmana Designs a reasonable opportunity to choose between several levels of coverage, obtained Carmana's agreement to limit coverage to $1.25 multiplied by a weight lower than the 24,000 pound figure recorded on the bill by North American. A reasonable opportunity to choose between different levels of coverage "means that the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." Bio-Lab, 911 F.2d at 1582 quoting Hughes, 829 F.2d at 1419.
 
 
 26
 These bills clearly provide the shipper with three choices of coverage, $.60 per pound, $1.25 per pound, or a lump sum declared value of the shipment. Ordinarily, the use of these bills of lading when accompanied by specific information regarding the different costs of the several options would provide the customer with a reasonable opportunity to choose between levels of coverage.
 
 
 27
 Here, however, Vona claims he was led to believe that Carmana Designs was fully covered because North American recorded the 24,000 pound figure as the net weight of the shipment in two places on the primary bill of lading. The figure appeared at the top of the valuation column in the space for certified weight of the shipment and in the "net weight" space used for figuring additional charges in the lower right corner of the bill.
 
 
 28
 These bills of lading state that, prior to shipping, the unloaded weight of the truck must be entered at the top of the valuation column and subtracted from the gross weight of the loaded truck to determine the net weight of the shipment. Here, these procedures were bypassed; North American simply entered the net weight of the shipment as 24,000 pounds for reasons not clear from the record. North American did not inform Vona or anyone at Carmana Designs why it included this figure as the shipment's weight nor present Vona with a means to determine an alternate certified weight.
 
 
 29
 Vona's uncontradicted testimony at deposition establishes that he relied on the 24,000 pound notation to decide whether or not the full value of his shipment would be covered in case of loss. Vona said,
 
 
 30
 [A]fter reading [the valuation column], I firmly felt that I was entitled to $1.25 per pound for shipping. When I looked up at the top to see what they had as the weight and I saw 24,000 pounds, I did a quick multiplication and that came out to $30,000. I felt I was covered.
 
 
 31
 Indeed, Vona's testimony is supported by the form itself. Vona signed his name twice within the value-tabulating column; below North American's inscription that the weight of the shipment was 24,000 pounds and underneath the statement declaring that the "shipment will be deemed released to the maximum value of $1.25 times the weight of the shipment in pounds." North American made no provision for weighing the shipment but instead had typed the figure of 24,000 pounds and required Vona to certify to this weight. Under these circumstances, we deem the certification to be nothing more than an implied agreement that transportation charges and liability would be determined on this basis. In light of North American's insertion of this weight figure within the column for computing value and tariff, we conclude that Vona reasonably interpreted the agreement to mean that the 24,000 pound figure would be used to determine North American's maximum liability to the shipper.
 
 
 32
 The district court, however, found that Vona was aware that the actual weight was less than 24,000 pounds and, thus, Carmana Designs was entitled to no more than the product of $1.25 times 9,275 pounds, the weight of the shipment stipulated by the parties after the accident. Nowhere in the record, however, does Vona state that he was aware prior to the shipment that it actually weighed less than 24,000 pounds; indeed, he testifies that he did not know then the weight of the shipment. Even if Vona knew the shipment actually weighed less than 24,000 pounds, North American was almost in total control of the transaction, and it would have been reasonable for Vona to assume that the net weight of the shipment supplied by North American and recorded twice in the value tabulation column would be the weight used to determine the shipper's coverage, especially considering the absence of any other weight for the shipment determined prior to shipping.
 
 
 33
 It is, thus, apparent from this record that, prior to shipping his goods with North American, Vona did not make an "absolute, deliberate and well-informed choice" to limit North American's liability to $1.25 times the actual weight of the shipment, 9,275 pounds. Here, neither the carrier nor the shipper knew the actual weight at the time of shipment, much less recorded it on the bill of lading prior to shipment.
 
 
 34
 Furthermore, North American placed the only reference to "actual" weight in small type in the middle of the back of its form. Although courts must presume that a person who signs a contract has read it in its entirety, the inconspicuous presentation of critical limiting language is one factor used to determine whether a shipper's choice is well-informed. Bio-Lab, 911 F.2d at 1582-83. Thus, when the face of the bill of lading supports one amount of covered value, the printed portion on the back of the bill will not establish a different value "unless it is reasonably clear that the shipper was specifically aware of that provision." Id. at 1583; see also Hughes, 829 F.2d at 1419 ("any limitation of liability must be brought to the attention of the shipper before the contract is signed"). Here, there is no such evidence. The carrier never brought the limitation of liability on the reverse side of the bill of lading to the shipper's attention. The certification of weight required of the shipper plus the imprint of the weight on the face of the bill of lading had the effect of diverting attention from the weight reference on the reverse side of the bill of lading. Therefore, we find unpersuasive North American's argument that, because of the reference to "actual weight" on the back of the bill of lading, Vona should have discounted North American's use of 24,000 pounds twice on the front of the bill.
 
 
 35
 If Carmana Designs were a sophisticated shipper or had extensive dealings with North American prior to this accident, we would be more receptive to North American's argument. A shipper's sophistication, abundant experience, or extensive prior dealings with a carrier may constitute additional evidence of a limitation agreement between the parties. See Norton, 901 F.2d at 823; Mechanical Technology, Inc. v. Ryder Truck Lines, 776 F.2d 1085, 1086 (2nd Cir.1985); Boeing Co. v. U.S.A.C. Transport, Inc., 539 F.2d 1228, 1230 (9th Cir.1976). Carmana Designs, however, had shipped with North American only once before the accident. And Carmana previously had not received any additional information from American Priority or North American regarding the limits of coverage or the necessity of separately purchasing insurance for the shipment.
 
 
 36
 In considering the legal rights of the parties, it is appropriate to weigh their respective interests. The defendant is a certificated common carrier of goods whose liability under the law for the delivery of the merchandise is absolute unless qualified by the voluntary consent of the shipper. An indispensable requirement in an interstate common carrier's business is the issuance of Bills of Lading for each shipment, a practice it engages in day in and day out. Transportation for profit is its business; the shipper's experience in shipping merchandise by motor carrier is often, as it is in this case, only occasional. The bill of lading is the handiwork of the common carrier; it is drafted by the carrier and is prepared by it for the signature of the shipper. The language of the bill of lading is the carrier's which has the utmost familiarity with it. Therefore, in balancing the interests of the parties, any ambiguity in the language of the bill of lading must be construed against the carrier. Moreover, as the weight of the cargo is a critical factor in determining the shipping costs and the liability for the value of the merchandise, it should be the carrier's responsibility to determine the weight.
 
 
 37
 Shippers frequently do not have the facilities to weigh cargo and, in this instance, the common carrier knew the shipper had not weighed the cargo. The carrier provided no facilities for weighing, but predetermined the net weight, inserted it in the appropriate space, and presented it to the shipper for its signature. The only optional figure on the bill of lading was a lump sum amount for liability purposes. The shipper, however, chose to rely on the figure imprinted on the bill of lading for the weight multiplied by $1.25 per pound offered by the carrier. This figure was acceptable to the carrier. Under these circumstances the carrier is estopped from turning to the actual weight of the cargo after the loss. A certificated common carrier may not hold itself out to the shipping public as responsible for the loss of cargo on one basis and after the loss seek shelter in a weight formula that was never the basis for the shipping transaction.
 
 
 38
 The record in this summary judgment case contains no material facts in dispute. To summarize, Carmana Designs was a relatively new customer of North American. In its bills of lading with Carmana Designs, North American had pre-recorded figures for the shipment's certified weight of 24,000 pounds on one bill and 34,000 pounds on the other. North American did not present Carmana Designs with other options for weighing the shipment, nor did it explain the meaning or significance of the certified weight. North American also printed the 24,000 pounds figure in a space entitled "net weight" used to assess additional shipping charges. The placement of these weights occurs within a single column for computing the value and coverage of the shipment. Carmana's agent Vona testified that after reading the agreement, he believed the recorded weight would be used to determine North American's maximum liability and that this shipment was covered. Such a reading is plausible and not unreasonable. Indeed, we see no evidence in the record that North American could meet its burden of proof at trial that it properly limited its liability arising out of this accident to $12,156.25.
 
 
 39
 On the other hand, we conclude that Carmana Designs is entitled to the full value of the goods destroyed and no more. The plaintiff asks this court to enter summary judgment in its favor for $42,500, representing the product of $1.25 times the unexplained 34,000 pound figure found on the second bill of lading. Here, the value of the exhibits clearly was $25,166, the amount Macy's had agreed to pay Carmana. No reasonable shipper could expect to recover more than the total value of their shipment without first procuring additional insurance coverage for that purpose. The declaration in the bill of lading signed by Vona provided only that the "maximum" value of recovery would be $1.25 times the weight of the shipment. The use of the term "maximum" implies that a shipper may be fully reimbursed for the loss of his goods without resort to the limits of the carrier's agreed liability. Obviously, when the maximum amount exceeds the full value of the shipment, the customer is entitled to the actual value of his goods, not the maximum value.
 
 III.
 
 40
 In sum, we hold that the carrier North American agreed to cover the value of Carmana Designs' goods up to $1.25 multiplied by 24,000 pounds. North American a fortiori did not limit its liability to Carmana to the amount found by the district court. Accordingly, the judgment of the district court will be vacated and the case remanded with directions to the district court to enter judgment for Carmana Designs in the amount of $25,166, the value of the destroyed goods. Costs taxed against the appellee.
 
 
 
 [1]
 Federal law governs the merits of this action. 49 U.S.C. § 11707. That section also provides for federal jurisdiction in the judicial district in which the shipper's loss or damage occurred. 49 U.S.C. § 11707(d)(2)(A)(iii). Because the plaintiff here brought its action in another judicial district, federal jurisdiction in the district court existed only under the diversity statute, 28 U.S.C. § 1332. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291