**FIRST NATIONAL BANK & TRUST COMPANY OF NEWTOWN,**
Plaintiff,

v.

**CONSOLIDATED FREIGHTWAYS, Emery & Purolator Worldwide and Cargo, Purolator Courier Corp., Defendants.**

Civ. A. No. 89–8610.

United States District Court,
E.D. Pennsylvania.

June 17, 1992.

On Motion for Reconsideration
July 24, 1992.

**1264**

Kathleen A. Kerrigan, Stuckert & Yates, Newtown, Pa., for plaintiff.

Andrew J. Walko, Paul D. Keenan, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for defendants.

## OPINION

GAWTHROP, District Judge.

First National Bank & Trust Company of Newtown instituted this suit against its common carrier for damages caused by the carrier's delay in delivering five shipments of bank documents. Defendant, Purolator Courier Corporation, admits that the delivery was delayed, but claims that its liability is limited to the amount stated on the bills of lading for each shipment. After a two-day, non-jury trial and review of the briefs, counsel's stipulations, and the evidence of record, I make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff is First National Bank & Trust Company ("FNB") of Newtown, Pennsylvania, a National Banking Organization, having its principal place of business at 40 S. State Street, Newtown, Bucks County, Pennsylvania.

2. Defendant, Purolator Courier Corporation ("Purolator"), is a Delaware corporation with its principal place of business at 131 Morristown Road, Basking Ride, New Jersey.

3. Purolator is a common carrier engaged in interstate and intrastate commerce, therefore, subject to ICC regulations and the provisions of the Pennsylvania Public Utilities Code, 66 Pa.C.S. § 101 et seq.

4. Purolator operated as a common carrier in Pennsylvania during the actions complained of in this lawsuit, from October 1988, to May 1989.

5. Defendant, Emery & Purolator Worldwide and Cargo, is not a corporation registered to do business in the Commonwealth of Pennsylvania and is also not registered as a fictitious name.

6. Consolidated Freightways, Inc. ("Consolidated Freightways") is a holding company incorporated under the laws of the state of Delaware.

7. Consolidated Freightways owns 100% of the stock of Emery Air Freight, which owns 100% of the stock of Purolator.

8. Consolidated Freightways had no contractual relationship with FNB at any time relevant to this action. There is no evidence that Consolidated Freightways was the entity providing courier service to FNB.

9. For at least fifteen years, plaintiff, FNB, contracted with Purolator to make intrastate shipments of small packages, at the end of each banking day.

10. The packages were taken by Purolator from FNB in Newtown to its correspondent bank in the Federal Reserve System, which is located in Philadelphia.

11. These packages carried by Purolator contained FNB's cash letter, which consisted of canceled, non-negotiable, checks, together with a deposit slip reflecting the face amount of the checks.

12. Each day the checks were packaged and shipped in an identical type of plain box, pre-printed with the name of the receiving bank. FNB left the shipments in a vestibule of the bank, between two sets of locked, double doors, for after-hours pickup by Purolator.

13. FNB and Purolator had a routine practice of Purolator's supplying the same evening delivery of the cash letter boxes and letters, between approximately 6:00 p.m. pickup and 11:00 p.m. delivery to the correspondent bank.

14. Purolator charged the bank a flat monthly amount of $412.57 for this service.

15. During the time period of 1988 until April 1989, each Purolator bill for the cash letter service was for the same amount—$412.57.

16. Neither FNB nor Purolator submitted any evidence as to how the flat fee was calculated or on what it was based.

17. Neither FNB nor Purolator presented any written contract concerning the service.

18. All Bills of Lading for FNB's pickups were provided by the carrier in bulk to FNB, and were pre-printed with the name of the shipping bank and FNB's correspondent bank in the Federal Reserve System. All Bills of Lading were issued before the movement of the shipments at issue in this action.

19. Employees in FNB's Proof and Transit Department would fill out the blank Bills of Lading. It has been and continues to be the routine practice of that department to identify such daily shipments as "boxes" and "letters" on the carrier's Bill of Lading. FNB did not identify the specific contents of the shipments; nor did it declare a value in the space provided.

20. Shipment number 1, the October 31, 1988, cash letter of FNB, was not timely delivered to the correspondent bank. Purolator misplaced it, and it was not found until on or about November 15, 1988.

21. FNB shipments number 2 of May 18, 1989, numbers 3 and 4 of May 24, 1989, and number 5 of May 26, 1989, were not delivered by the carrier before the required time of 11:00 p.m. the evening of the pick-up.

22. The carrier picked up all five shipments at issue in this action at FNB on the date indicated on the Bill of Lading for the shipment.

23. The bills of Lading provided by the carrier in transporting FNB's cash letter for the October 31, 1988, shipment and the May 18, 1989, shipment bore the name "Purolator Courier Corporation."

24. The Bills of Lading provided by the carrier in transporting FNB's cash letter for the May 24, 1989, and May 26, 1989, shipments bore the name "Emery & Purolator Worldwide Courier & Cargo."

25. David Foster, the Vice-president of Operations for FNB, testified as to having observed carrier employees in Purolator uniforms and a van with "Purolator" on the outside into which the shipments were placed.

26. The appellation, "Emery & Purolator Worldwide Courier and Cargo", instead of "Purolator", appeared on a number of documents. It was on the May 24 and 26 Bills of Lading provided by the carrier, some publicity sent by defendants to FNB, and the letterhead on various correspondence between the parties.

27. Three of the Bills of Lading for the cash letter bear the signature of employees of FNB's Proof and Transit Department, while two Bills of Lading do not (P-2 through P-5).

28. The contents of the FNB cash letter consisted of non-negotiable (canceled)

checks drawn on banks other than FNB, which checks had been received each day by FNB and credited to the depositor's FNB account. The canceled checks were then sent to the correspondent bank in the Federal Reserve System for clearance, as well as for payments on loans and other internal bank debit and credit items.

29. FNB needed to have its canceled checks delivered to its correspondent bank by the carrier each day before 11:00 p.m. so that the face amount of those items would be reflected as available funds in FNB's account the next morning.

30. When FNB's correspondent bank receives the cash letter each night, it credits FNB with the cash letter face amount, but the cash letter and canceled checks have no negotiable value outside the banking system.

31. The value to the bank of the cash letter is measured in two ways. The face amount of the cash letter, usually in the 4 to 5 million dollar range is credited to FNB as available funds. It is listed as an asset to FNB. However, if the cash letter were lost, the bank would not lose 4 to 5 million dollars. Instead, the value of the cash letter would be the cost to reconstruct it, the amount of costs incurred to borrow funds in the Federal Reserve System to maintain the minimum balance required at the correspondent bank, and the loss of earnings on any funds which exceed the minimum balance, which funds may be lent in the Federal Reserve system.

32. The value of the cash letter to anyone outside the bank is zero.

33. At no time was there a risk of loss of the total face amount of the non-negotiable checks carried in FNB's cash letter by the carrier, because FNB maintained filmed copies of each item.

34. In the Federal Reserve System, a copy of each canceled check constituting the cash letter, reconstructed from filmed copies, may be substituted for the original by FNB and its correspondent bank.

35. Items of actual value, such as cash or negotiable instruments, were, and are always, shipped by FNB via armored car

service, with the Bill of Lading bearing the actual value of the amount shipped.

36. FNB did not ship the cash letter by armored car, nor did it fill in an actual value on the Bill of Lading because there is no negotiable value for the canceled checks and other items contained therein.

37. Following the carrier's having lost FNB's cash letter on October 31, 1988, FNB personnel reconstructed the entire cash letter by having the film of the checks developed, and then cutting and taping together each check. FNB incurred labor and other related costs of $3,090.39 to reproduce the lost cash letter and deliver it to its correspondent bank.

38. FNB had submitted a portion of the reconstructed cash letter to its correspondent bank for credit before the discovery and return of its cash letter by the carrier on or about November 15, 1989.

39. Concerning the October 31, 1988, cash letter, the face amount of the canceled checks was $10,083,827.79, which amount was not reflected in the account data for FNB at its correspondent bank from October 31, 1988, until on or about November 15, 1988.

40. The loss of the October 31, 1988, cash letter by the carrier caused FNB to be required to borrow amounts of money, ranging from 1 million to 8.8 million dollars, to maintain required minimum balances. This had to be done each banking day until the reconstructed cash letter and/or the original cash letter, when found, was submitted to the correspondent bank.

41. The interest paid by FNB on the amounts borrowed was $8,601.38. The interest was calculated at rates determined by the Federal Reserve.

42. FNB is permitted to loan funds contained in its account at its correspondent bank which exceed its required balance in the Federal Reserve System.

43. As a result of the loss of the October 31, 1988, cash letter by the carrier, FNB lost $18,716.95 in earnings which it would have received for loaning the excess funds. This figure is based on the applica-

ble Federal Reserve interest rate for the time period.

44. As a result of the delays in delivery by the carrier for the May 18, 24, and 26, 1989, cash letters from FNB, FNB incurred total costs of $1,898.63 in interest for borrowing 2.1 million to 2.6 million dollars to maintain its required minimum balance in the Federal Reserve System.

45. As a result of the delays in delivery by the carrier for the May 18, 24, and 26, 1989, cash letters from FNB, FNB lost $1,546.44 in earnings, which it would have received for loaning excess funds. Like the October 31, 1988, shipment, this figure is based on the applicable Federal Reserve interest rate.

46. Plaintiff timely notified Purolator of its claim.

47. Tariff number 102 of Purolator Courier Corporation (hereinafter, the tariff), is an intrastate tariff, filed in March of 1987, with the Pennsylvania Public Utility Commission, and effective April 22, 1987, for common carrier service within the Commonwealth of Pennsylvania.

48. The tariff is divided into four sections. The first section is "Rules and Regulations", which govern the application of rates contained in section two—Bank Commodity Rates—and section three—General Commodity Rates. Section four is the Zip Code Mileage Chart.

49. All tariff rates are based on weight, distance, and number of items shipped.

50. The flat monthly contract amount charged FNB by the carrier is not found in the tariff, as it is a flat monthly amount for the courier service.

51. The only provision in the tariff providing for billing of a flat monthly amount is in Item 10 with an average weight agreement.[1] Neither party presented evidence as to the existence of any weight agreement. Indeed, the absence of any written documentation of this agreement, when such documentation is required by the tariff, leads me to find, inferentially, that there was no such weight agreement.

52. In the section on Rules and Regulations, Item 20 on original page 9, the tariff sets out carrier liability and declaration of value. The tariff states that "the rates and charges named in this tariff are dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property."

53. The two paragraphs in Item 20 discuss released valuation and the rate basis.

54. Paragraph A is "applicable to the transportation of cash letters, letters of transmittal, checks, drafts, notes money orders, travelers checks and other bank related commercial papers, documents and written instruments for banks and banking institutions pursuant to ordering paragraphs 1 and 2 of the operating authority of Purolator Courier Corp. at Docket No. A–80419, Folder 2." [2]

---

1. The tariff provides: "where in lieu of weighing individual shipments daily, the shipper may arrange with the carrier to establish a daily average weight per shipment per destination to be used for calculating future charges. The average weight shall be determined for a one-month period, with such period to be agreed upon by the shipper and carrier and shall be redetermined or discontinued upon the request of either party. (c) the Shipper shall provide written notice to carrier of the average weight(s) per shipment he has elected to use for calculating charges during a calendar month ... (e) if carrier declines to accept the shipper's election, it will notify the shipper in writing promptly, after receiving such written notice. (f) if actual shipment weights differ from the Average Weight Agreement, carrier, upon verification of such difference, shall assess tariff charges on actual shipment weights, and shall promptly notify shipper of such difference."

2. The operating rights of Purolator as a common carrier in Pennsylvania are listed on page 5 of the tariff. The operating authority of Purolator as a transporter extends to, in Paragraph (1): "Commercial papers, documents and written instruments (excluding securities, coins, currency and bullion) as are used in the operation of banks and banking institutions between points in Pennsylvania, and in Paragraph (2): "Commercial papers, documents and written instruments (excluding securities, coins, currency and bullion) as are used in the operation of banks and banking institutions by interchange with Purolator Security, Inc.," between various counties and cities of Pennsylvania. Only Paragraph (1) would be applicable here if the tariff itself is applicable.

55. Paragraph B is "applicable to the transportation of all commodities except those in Paragraph A."

56. In paragraph A dealing with banking documents, in exchange for the carrier's liability to be "released to a value not to exceed $25,000 in the aggregate per shipment," the shipper pays the base transportation rate.

57. Paragraph A provides that the shipper has the option to declare a value in excess of $25,000 in the aggregate per shipment but not to exceed $50,000 in the aggregate per shipment, and in exchange the shipper pays the base transportation rate plus a value charge of 50 cents for each $100, or fraction thereof, of value in excess of the valuation to which the base rate applies.

55. In paragraph B dealing with all commodities not named in paragraph A, the carrier's liability can be released to a value not exceeding $250.00 per shipment, with the shipper paying the base transportation rate. The shipper can declare a value exceeding $250.00 per shipment but not to exceed $5,000 and in exchange, pay the base transportation rate plus a value charge of 50 cents for each $100, or fraction thereof, of value in excess of the valuation to which the base rate applies.

56. The two Bills of Lading with Purolator's name on them—for the October 31, 1988, and May 18, 1989, shipments—bore a $250 limitation of liability provision, which corresponds to the released value of Paragraph B, non-cash letter, non-banking commercial papers, in Item 20 of the tariff.

57. The three Bills of Lading bearing the name Emery & Purolator Worldwide Courier and Cargo, for the May 24, 1989, and May 26, 1989, shipments, state a $100 limitation of liability, which is not included anywhere in the tariff of the carrier.

58. Purolator has stipulated to the entry of judgment against it on Count III of the complaint, alleging excess charges for the carrier service, in the amount of $6,087.09. This amount reflects a $900 credit to Purolator based upon FNB's monthly bill of $412.57.

## DISCUSSION

### 1. *Jurisdiction and Parties*

Subject matter jurisdiction in this case is based on diversity of citizenship under 28 U.S.C. § 1332(a)(1).

Defendants claim that Purolator is the only proper defendant in this case, Consolidated Freightways being merely a holding company with no contractual relation with plaintiff and Emery & Purolator Worldwide Courier and Cargo being only a trade name. The May 24 and May 26, 1989, bills of lading do bear the name Emery & Purolator Worldwide Courier and Cargo, as does some other correspondence received by plaintiff. The Commonwealth has certified, however, that "Emery & Purolator Worldwide and Cargo" is not registered as a corporation or fictitious name in Pennsylvania. Plaintiff's witnesses testified that the courier service drivers displayed Purolator emblems on their uniforms and their vehicle.

■ While plaintiff may have corresponded with persons identified as employees of Emery or Consolidated Freightways, plaintiff's evidence is insufficient to allow the court to infer that Emery & Purolator Worldwide Courier and Cargo is a separate corporate entity from Purolator, and that it, instead of Purolator, provided courier service to FNB. The fact that Purolator stock is owned by Emery Air Freight, whose stock is, in turn, owned by Consolidated Freightways does not prove plaintiff's assertion that a different legal entity from Purolator provided courier service to FNB during the time period here at issue. Purolator has claimed that no one but it is responsible for carriage of all five shipments. I agree. The liability for damages assessed in this case will run against only Purolator.

### 2. *Purolator's Common Carrier Liability*

■ As a common carrier, transporting FNB's shipments between points in Pennsylvania, Purolator's liability is governed by the Pennsylvania Public Utilities Code,

66 Pa.C.S. § 101, et seq. Section 2304(a) of that Code sets out the general rule for common carriers engaging in intrastate shipments. The statute provides:

> Every common carrier that receives property for transportation between points within this Commonwealth *shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it,* or any other common carrier to which such property may be delivered, or over whose line such property may be transported. No contract, receipt, rule or regulation shall exempt such common carrier from the liability hereby imposed. *The commission may, by regulation or order, authorize or require any common carrier to establish and maintain rates related to the value of shipments declared in writing by the shipper, or agreed upon in writing as the release value of such shipments; such declaration or agreement to have no effect other than to limit liability and recovery to an amount not exceeding the value so declared or released.* Any tariff filed pursuant to such regulation or order shall specifically refer thereto.

66 Pa.C.S. § 2304(a) (Emphasis supplied).

Purolator claims that its liability is limited under 66 Pa.C.S. § 2304(a) to $800.00, the total of the released values [3] on the five bills of lading at issue. It contends that because it filed a tariff, which included released-value limitation-of-liability provisions, and because plaintiff signed bills of lading containing those released value provisions, its liability is limited to the released value. Plaintiff counters that defendant is fully liable for all losses incurred because it did not comply with the requirements of § 2304 to limit their liability. Specifically,

among other things, plaintiff claims that because defendant charged a flat monthly amount for the same-day service to FNB, instead of charging the tariff rate corresponding to the released value [4] of the package, Purolator cannot rely on the tariff to limit its liability.

■ The statute provides that common carriers are strictly liable for any loss, damage, or injury to the shipper's property, caused by the carrier. The only way a common carrier can limit its liability is to establish rates that relate to the value of the shipment. If the shipper declares the value of the shipment in writing on the bill of lading, the carrier's liability is limited to that declaration of value. If the released value is printed on the bill of lading, and the shipper evidences its agreement with that released value by signing the bill of lading, for example, the carrier's liability is limited to that released value printed on the bill of lading.

The statutory scheme gives the shipper—here, FNB—a choice between paying the lower rate corresponding to the released value on the bill of lading and assuming more liability for loss, or paying a higher rate corresponding to the value it declares and leaving full liability for loss on the carrier. "In order to make the limited liability provisions of the Public Utility Code applicable, all of the specific requirements must be satisfied." *Gastwirth v. Mashbitz & Sons, Inc.,* 414 Pa. 445, 448, 200 A.2d 766, 767 (1964).

The Pennsylvania cases under § 2304(a) are few and generally inapposite to the issues here presented. However, federal caselaw, under the similar, *in pari materia,* Interstate Commerce Commission

---

3. "Released value" is the value agreed upon by the carrier and shipper as the carrier's liability. The monetary amount selected by the carrier as its liability corresponds to the rate charged to the shipper and has no real relation to the actual value of the item shipped. The released value of a package shipped is in the carrier's filed tariff and is printed on the carrier's bills of lading. By signing the bill of lading without filling in a declared value different from the pre-printed monetary amount found in the space for released value, the shipper evidences its agreement to release the carrier from all liability exceeding the amount agreed to as the released value.

4. FNB vice-president, Mark Foster testified that it is FNB's custom and practice never to declare a value on the bills of lading, because there is no negotiable value to the cash letter and canceled checks. It is undisputed that FNB did not declare a value on any of the shipments at issue.

("ICC") statutes,[5] provides useful guidance in this area, since the only distinction is that ICC statutes apply in the interstate rather than intrastate context. I find them persuasive authority.

■ The general rule is to hold common carriers liable for the actual injury to goods shipped; thus, arrangements attempting to limit liability are strictly construed against the carrier. *See Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103, 109 (1st Cir.1978); *Flying Tiger Line v. Pinto Trucking Service*, 517 F.Supp. 1108, 1112 (E.D.Pa.1981). Accordingly, the carrier has the burden of establishing that its liability is limited. *See Carmana Designs Ltd. v. North American Van Lines Inc.*, 943 F.2d 316, 319 (3d Cir.1991). Here, plaintiff has proven that Purolator did not timely deliver its shipments; therefore, it will be entitled to damages for actual loss, unless Purolator carries its burden of proving that its liability was limited.

■ A carrier may limit its liability if it complies with the ICC, or in this case PUC, statutory requirements. It must: 1) maintain a valid tariff and charge the approved lower rates; 2) give the shipper a reasonable opportunity to choose between two or more levels of liability, allowing the shipper to pay a higher rate and thereby increase the carrier's liability; 3) obtain the shipper's agreement to the released value in writing; and 4) issue a bill of lading, before moving the shipment, that reflects the agreement. *See Carmana Designs Ltd. v. North American Van Lines Inc.*, 943 F.2d 316, 319 (3d Cir.1991); *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st. Cir.1978); *W.C. Smith, Inc. v. Yellow Freight Systems, Inc.*, 596 F.Supp. 515 (E.D.Pa.1983).

In the case at bar, Purolator has generally met two of these requirements. It met the third requirement, by obtaining the signature of the shipper on three of the five bills of lading with the released value provision. It also met the fourth requirement, by issuing the bills of lading prior to the shipment. However, Purolator failed to show that it met the first two requirements of the statute: 1) that the carrier maintain and charge tariff rates; and 2) that the shipper be provided an opportunity to choose between different rates based on value.

■ While the language of 66 Pa.C.S. § 2304(a) does not include the requirement that the carrier "charge" the tariff rate in order to limit liability, the plain reading of the statute, the cases interpreting the parallel ICC statutes, and the common law convince me that that requirement is implicit in the statute. Courts have allowed carriers to limit their liability when the rate charged is dependent upon the value of the property, because the "agreed upon value merely constituted an estoppel against the unfairness of asserting a larger amount as the true value when the carrier was sued for damages in spite of the fact that a smaller value had been used to calculate the rate." *First Pennsylvania Bank v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1116 (3d Cir.1984).

■ When the amount charged is not a tariff rate, dependent on the value of the property, but a flat amount, bearing no discernible relationship to the tariff rate schedule, the shipper is not given a reason-

---

5. 49 U.S.C. § 11707(a) and (c) (recodifying the Carmack Amendment to the Interstate Commerce Act (formerly 49 U.S.C. § 20(11)) reads in pertinent part:

(a) Any common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... shall issue a receipt or bill of lading for property it receives for transportation under this subtitle ... That carrier ... [is] liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by [the carrier].

(c)(4) A common carrier may limit its liability for loss or injury of property transported under section 107030 of this title.
49 U.S.C. § 10730(a) provides in pertinent part: The Interstate Commerce Commission may require or authorize a carrier ... providing transportation or service subject to its jurisdiction ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.

able opportunity to choose between higher and lower rates. Hence, the carrier's liability cannot be limited by citing to the released-value provision in the tariff and the bill of lading. *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 863 (1st Cir. 1987); *Acro Automation Systems v. Iscont Shipping Ltd.*, 706 F.Supp. 413 (D.Md.1989); *Emily Shops, Inc. v. Inter–State Truck Line, Inc.*, 207 Misc. 557, 139 N.Y.S.2d 561 (1955), *aff'd*, 2 N.Y.2d 405, 161 N.Y.S.2d 46, 141 N.E.2d 560, *cert. denied*, 355 U.S. 827, 78 S.Ct. 36, 2 L.Ed.2d 40 (1957).

■ The evidence at bar shows that plaintiff was billed at a flat monthly fee of $412.57. Defendant presented no evidence that the flat fee was in any way related to the tariff rate schedule or that FNB and Purolator had negotiated an agreement that factored in the value of the property shipped and the limitation of the carrier's liability. In a case where the shipper disregarded the tariff and charged a flat amount, the court in *Emily Shops, Inc. v. Inter–State Truck Line, Inc.*, 207 Misc. 557, 139 N.Y.S.2d 561 (1955), *aff'd*, 2 N.Y.2d 405, 161 N.Y.S.2d 46, 141 N.E.2d 560, *cert. denied*, 355 U.S. 827, 78 S.Ct. 36, 2 L.Ed.2d 40 (1957), determined that the carrier would not be allowed to take advantage of the limitation of liability provisions in the tariff, noting:

> The difficulty with the defendant's position is that its charge ... was not merely an excessive rate. It was no rate at all. The charge was "a flat sum of $115.00." A flat sum is not a rate. It is the opposite of a rate. The defendant, in doing what it did, acted as if there were no rates or tariffs and no regulatory law. Having completely ignored the law, the defendant should not be permitted to profit by the limited liability provisions contained in the law....
>
> The flat sum deal made by this defendant was not a choice of rates either at common law or under the Interstate Commerce act. Where the statute and

the rates are completely disregarded and there is actually no choice of rates, the liability limitations of the statute do not apply. *Id.* 207 Misc. at 559, 139 N.Y.S.2d 561.

Relying on the language and the logic of the *Emily Shops* case, the court in *Acro Automation Systems, supra,* at 418 and 419, found that even though the carrier in that case maintained a tariff with a choice of rates depending on the released or declared value of the property, by charging a flat amount for the service, the carrier did not give the shipper an opportunity to make a deliberate and well-informed choice between a lower rate with more assumed risk of loss and a higher rate with risk of loss placed on the carrier. "There must be a *bona fide* alternative enabling the shipper to declare a higher valuation upon paying a higher rate, in order for the carrier to limit its liability to the released value at the lower rate." *First Pennsylvania Bank, supra,* 731 F.2d at 1117; *see also Union Pacific R.R. Co. v. Burke,* 255 U.S. 317, 323, 41 S.Ct. 283, 285, 65 L.Ed. 656 (1921).

Purolator went outside the tariff to arrange with FNB a service in which FNB paid a monthly amount for Purolator to make a daily pickup of packages, the number and weight of which varied each day, for same evening delivery to another bank. The bills of lading in this case were used merely as receipts, proof that the packages had been picked up, since they were not filled out by the carrier or used as invoices for payment. Any other evidence on Purolator's arrangement with FNB is noticeably absent from the record. For example, there was no evidence as to how the monthly bill was calculated, whether it had anything to do with tariff rates, or had any reasonable relationship to the valuation of goods. Neither party presented any evidence as to who had negotiated payment for the service, when the arrangement was started, or how long it was in effect before the shipments at issue here.[6] Purolator's arrangement with FNB "departed from the

---

6. Mr. Foster, Vice–President of Operations for plaintiff did testify that whatever arrangements Purolator had made with the bank, it had been done before he had started working at FNB, eight years ago.

scheduled rates, eschewed the filed tariff, and was [entered into] without regard to the size, weight, or value" of the packages transported. *Polyplastics, Inc. v. Transconex, Inc., supra,* 827 F.2d at 863.

■ It is true that the shipper is charged with constructive knowledge of the contents of the carrier's published tariff, *First Pennsylvania Bank, supra,* 731 F.2d at 1117, so that if the tariff has two rate schedules with higher and lower liability corresponding to a greater or lesser charge, the shipper is deemed to have an opportunity to choose between rates. By paying the lower rate charged by the carrier, the shipper is bound by the carrier's limitation of liability provision. In the case at bar, Purolator's tariff provided for the charging of lower and higher rates based on the released or declared value with corresponding liability-limitation provisions,[7] and the limitation of liability provision on the back of the Bills of Lading refers the shipper to Purolator's Worldwide Directory[8] or, if applicable, its tariff. Knowledge of the tariff's value provisions that corresponded to higher and lower rates would not have helped FNB to make an informed choice of rates, however, because the flat fee it was charged and paid did not correspond to the released value rate or any other rate schedules set out in the tariff.

■ Purolator claims that FNB did have a choice between two rates, since the bills of lading provide that if a greater value than the released value is declared, an excess declared value charge will be assessed at the rate of 50 cents per $100.00 of excess declared value. But this was not a choice between two rates, in the real meaning of the term "rates"; rather, it was a choice between a flat contract amount and presumably, a surcharge on

that amount, although one cannot know for sure how that would be calculated, since FNB never declared a value greater than the released value. Purolator has not shown that FNB, as the shipper, had an alternative in the tariff rate schedules to the flat monthly amount charged by Purolator.

The choice Purolator gave FNB is analogous to the choice given the shipper in *Polyplastics, Inc. v. Transconex, Inc.,* 827 F.2d 859, 863 (1st Cir.1987). There, the carrier, Transconex, Inc., gave the shipper, Polyplastics, Inc., a choice between shipping its trailer using a flat fee of $500.00, allowing the carrier to fill the trailer with other packages being transported, or paying the scheduled rate, which was in excess of $2500.00. The carrier left blank the boxes on the bill of lading which called for "rate," "measurements," and "weight." Also, no value was declared in the box provided in the bill of lading.[9] The *Polyplastics* court found that although the carrier maintained a valid tariff and the tariff and the bill of lading provided for a $50 liability limitation, the carrier was liable for the actual value of the trailer lost. The court reasoned that although the carrier "offered Polyplastics a choice between two rates, the lower of them was in no way 'conditioned upon [Polyplastics's] agreeing to a stipulated valuation of [its] property in case of loss.'" *Id.* at 863 (quoting *Union Pacific R.R. Co. v. Burke,* 255 U.S. 317, 321, 41 S.Ct. 283, 284, 65 L.Ed. 656 (1921)). Since there was no relationship between the lack of declared value of the trailer and the rate charged for shipment, the limiting clause would not be enforced against the shipper. *Id.* at 864.

■ Like the liability limitation clause in *Polyplastics,* the similar provision con-

---

**7.** *See* Purolator's Tariff, page 9, Item 20 Paragraph A for bank commodities and Paragraph B for general commodities. Each Paragraph contains two options: 1) limiting the liability of the carrier to the released value of the goods, where the shipper pays the base transportation rate and 2) limiting the liability of the carrier to the declared value of the goods, where the shipper pays the base transportation rate plus a value charge for each $100 declared over the released value in subpart 1.

**8.** This document was never put into evidence as part of the record.

**9.** The *Polyplastics* court noted that there was some question whether the shipper had an opportunity to see the bill of lading before the shipment, but they did not rest their decision on that ground.

tained in Purolator's bills of lading was not the basis of a reduced rate, since FNB was not charged the base transportation rate corresponding to the released value as provided in the tariff, but was instead charged a flat contract amount. FNB did not have the opportunity to choose between paying a low rate and assuming more liability, or paying a higher rate and placing risk of loss on the carrier. Because Purolator did not charge the tariff rate, thereby giving FNB an opportunity to chose between higher and lower rates, its liability is not limited by the liability limitation clause in the bills of lading.[10] Purolator is liable for all loss, damage, and injury proximately caused by its failure to timely deliver FNB's five shipments.[11]

### 3. FNB's Damages

▪ FNB's claim for damages consists of the following: 1) labor and other related costs to reproduce the misplaced October 31, 1988, cash letter; 2) interest on funds borrowed to meet the minimum required balance in FNB's accounts in the correspondent bank; and 3) interest FNB would have earned by loaning out the funds in excess of the minimum required balance. "Where goods lost in transportation have no market value in the ordinary acceptance of the term, compensation for the actual loss is the fundamental principal on which the measure of damages rests, and the value of the articles to the owner ... is the true measure of such damages." *Pennsylvania Law Encyclopedia*, § 252 Damages at 633; *see also Lloyd v. Haugh and Keenan Storage and Transfer Co.*, 223 Pa. 148, 72 A. 516 (1909); *Patterson v. Union*

*Transfer Co.*, 84 Pa.Super. 273 (1925). All damages claimed by FNB are compensation for actual losses, proximately caused by Purolator's failure to timely deliver the five shipments, and are recoverable.

▪ Purolator's claim that it was misled by FNB's fifteen-year practice of labeling the items to be shipped, "boxes and letters" is disingenuous. It is logical to infer that Purolator knew that it was not paid to make same-day delivery of empty boxes. The evidence on the record demonstrates that Purolator knew it was carrying bank documents, if not specifically cash letters, that needed to be delivered to a correspondent bank by 11:00 p.m. on the same night as pickup. Regardless of whether Purolator had actual knowledge of the specific type of bank document it was carrying, it is liable for FNB's actual loss, since it did not properly limit its liability according to its tariff.

▪ Defendant claims that FNB cannot claim as an element of damages the interest earnings it would have made by lending any funds that exceeded its minimum balance. The common law, generally, and Purolator's bill of lading, in particular, do not allow for recovery of loss of anticipated business profits in a damages claim for loss of goods by a common carrier. *See generally Pennsylvania Law Encyclopedia*, § 252 Damages at 634. This doctrine is not one of recent vintage. *See e.g. Bazin v. Liverpool & P.S.S. Co.*, 2 Fed.Cas. No. 1, 152, 3 Wall.Jr. 229 (1857); *Dusar v. Murgatroyd*, 8 Fed.Cas.No. 4,199, 1 Wash. C.C. 13 (1803); *cf. Hadley v. Baxendale*, 9 Exch. 341 (1854). Loss of profits is differ-

---

**10.** Purolator argues that even if it did charge plaintiff a flat amount, the liability limitations in the tariff must be enforced, since the filed rate doctrine forbids equitable defenses to the collection of the filed tariff. *See Maislin Inds., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 2761, 111 L.Ed.2d 94 (1990); *Bowser and Campbell v. Knox Glass, Inc.*, 390 F.2d 193, 194 (3d Cir.1968). The filed rate doctrine applies when the carrier does not charge the rates in its tariff and then seeks to recover the difference between the rates it charged and the rates in its filed tariff. In the two cases cited by defendant, the courts rejected the shippers attempt to avoid the filed rate doctrine, and payment of the undercharges, with the argument

that the lower rate charged had been agreed to by the parties. A suit by a carrier to recover the difference between the rate charged and the filed rate is readily distinguishable, however, from a suit by a shipper to recover damages caused by lost or delayed deliveries; therefore, the filed rate doctrine is inapplicable to the case at bar.

**11.** Because I have found, as a consequence of the carrier's charge of a flat fee for its service, that the tariff was inapplicable to this case, I make no finding on the validity of the tariff, which was challenged by plaintiffs.

ent, however, from a claim for loss of a specific, calculable amount of earnings made here. In contrast to the lost earnings claimed in this case, anticipated profits are often speculative. The evidence presented by FNB shows that its executives knew, by adding the amount of its cash letter to the money in its account in the correspondent bank, exactly how much extra money FNB would be able to lend, after meeting its required minimum balance. Hence, the interest it would have earned had Purolator timely delivered the five shipments is a sum certain, directly calculable. FNB lost those actual earnings as a direct result of Purolator's failure timely to deliver the five shipments at issue. FNB has proved its entitlement to damages totalling $33,853.79, for delay of the five shipments at issue, and will be awarded that amount plus the stipulated judgment for excess charges in the amount of $6,087.09. Judgment shall be entered in favor of the plaintiff for $39,940.88.

## CONCLUSIONS OF LAW

1. This court has jurisdiction in this matter pursuant to the provisions of 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $50,000.00.[12]

2. This diversity case is bound by Pennsylvania law.

3. Pennsylvania Public Utilities Code, 66 Pa.C.S. § 2304(a) provides that common carriers of intrastate shipments are absolutely liable "to the lawful holder thereof for any loss, damage, or injury to such property caused by it." It contains and exception, however, that common carriers may limit their liability to shippers by establishing and maintaining a tariff providing for "rates related to the value of shipments declared in writing by the shipper, or agreed upon in writing as the release value of such shipments; such declaration or agreement to have no effect other than to limit liability and recovery to an amount not exceeding the value so declared or released."

4. The carrier has the burden of establishing that its liability is limited. *See Carmana Designs Ltd. v. North American Van Lines Inc.*, 943 F.2d 316, 319 (3d Cir.1991).

5. In order to limit its liability as outlined in the tariff, a carrier must 1) maintain a valid tariff and charge the approved lower rates; 2) give the shipper a reasonable opportunity to choose between two or more levels of liability, allowing the shipper to pay a higher rate and thereby increase the carrier's liability; 3) obtain the shipper's agreement to the released value in writing; and 4) issue a bill of lading prior to moving the shipment that reflects the agreement. *See Carmana Designs Ltd. v. North American Van Lines Inc.*, 943 F.2d 316, 319 (3d Cir.1991); *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir. 1978); *W.C. Smith, Inc. v. Yellow Freight Systems, Inc.*, 596 F.Supp. 515 (E.D.Pa. 1983).

6. Because it charged a flat monthly amount, Purolator failed to show that it met the first two requirements of the statute: 1) that the carrier maintain and charge tariff rates; and 2) that the shipper be provided an opportunity to choose between different rates based on value.

7. Purolator's tariff is inapplicable; and therefore, its liability provisions in the tariff and the bills of lading will not be enforced.

---

12. Plaintiff, because of a miscalculation, discovered during trial, involving credit given to plaintiff by its correspondent bank, ultimately recovered only $39,940.88. This fact, however, did not oust this court of jurisdiction. Events occurring after the institution of the suit, which reduce the amount recoverable below the statutory limit, do not oust jurisdiction. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). The sum claimed by the plaintiff in its complaint, if made in good faith, and "not tra-

versed" by the defendant is what controls the analysis for meeting the required jurisdictional amount. *Gibbs v. Buck*, 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939). Here, plaintiff's complaint, which was removed to federal court by defendant, alleged damages of $55,648.89. The inability of the plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. *St. Paul Mercury, supra*, 303 U.S. at 288, 58 S.Ct. at 590.

8. Plaintiff, FNB, is entitled to actual damages incurred because of Purolator's delay in delivery of the shipments at issue.

An order follows.

## ORDER

AND NOW, this 17th day of June, 1992, after a non-jury trial, judgment is entered in favor of plaintiff, First National Bank & Trust Company of Newtown, and against defendant, Purolator Courier Corporation, in the amount of $39,940.88.

## ON MOTION FOR RECONSIDERATION

After a bench trial, this court filed an opinion on June 17, 1992, finding Purolator Courier Corporation ("Purolator") liable for the full damages caused by its delay in shipping five shipments of cash letters from First National Bank and Trust Company of Newtown ("FNB") to its correspondent bank in Philadelphia. The court found that Purolator's liability was not limited by its tariff or its bills of lading because it did not charge a tariff rate, but instead billed FNB at a flat, contract rate. Purolator has filed a motion for reconsideration. Having reviewed the opinion, the briefs, and the relevant caselaw, I reaffirm my original decision, upon the following reasoning.

## DISCUSSION

Purolator argues that this court erred as a matter of law in finding that because Purolator did not charge First National Bank ("FNB") its filed tariff rates, it could not limit its liability for delayed delivery of five shipments by applying the liability limitations found in its bills of lading. Purolator contends that the judgment should be amended to $800, the total amount provided for in the bills of lading, for two reasons: (1) Purolator claims that the court failed to consider or apply the provisions of 13 Pa.C.S. § 7309, concerning bills of lading and contractual limitation of liability; and (2) if the tariff applies, then the court must enforce all provisions of the tariff.

The consideration of 13 Pa.C.S. § 7309 supports, rather than contradicts this court's analysis of the interdependence between the carrier's charging of rates according to the value of the item shipped and the shipper's opportunity to choose between higher or lower rates, accepting a lower or higher risk, respectively. Section 7309 provides:

> (b) Contractual limitation of liability—Damages may be limited by a provision that the liability of the carrier shall not exceed a value stated in the document **if the rates of the carrier are dependent upon value** and the consignor by the tariff of the carrier is afforded an opportunity to declare a higher value or a value as lawfully provided in the tariff, or where no tariff is filed he is otherwise advised of such opportunity ... (Emphasis supplied).

As a condition precedent to the validity of a bill of lading's limitation-of-liability provision, a carrier must charge rates dependent upon value. This Purolator did not do. Thus, for the reasoning laid out at length in my previous opinion, Purolator's tariff does not apply and its liability limitations are not enforceable.

■ Since I reaffirm my conclusion that Purolator's filed tariff does not apply, I need not address Purolator's second argument that if the tariff does apply, the court must enforce all of its provisions. I do, however, deem it necessary to expand briefly on my treatment of the filed rate doctrine at footnote 10 of the opinion. Purolator argues that because it was entitled to charge and collect the filed tariff rate, even though it did not, the liability limitations in the tariff are enforceable as well. The filed rate doctrine provides that neither a carrier nor a shipper can avoid the filed rate. Even if a carrier charges and the shipper pays a negotiated amount, not included in the carrier's tariff, the carrier can still later collect any undercharges because the tariff rates are the only legal rates. *See Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990); *Bowser and Campbell v. Knox Glass, Inc.*, 390 F.2d 193, 194 (3d Cir.1968); *Interstate Commerce Commission v. Transcon Lines*, 968 F.2d 798, 808 (9th Cir.1992).

Purolator has pointed the court to no case, nor has my independent research unearthed one, that applies the filed rate doctrine in the context of a carrier's attempt to enforce its liability provisions after charging something other than a filed tariff rate. This is not a case in which the carrier is trying to recover undercharges of its filed rate. Here, the carrier seeks to enforce its tariff's liability limitations when it charged the shipper, FNB, a contract rate, rather than the legal tariff rate for carriage. Purolator's contention that the court mistakenly relied on *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859 (1st Cir.1987), to support its decision is unfounded. In *Polyplastics*, the carrier, Transconex, Inc., gave the shipper, Polyplastics, Inc., a choice between shipping its trailer using a flat fee of $500.00, allowing the carrier to fill the trailer with other packages being transported, or paying the scheduled rate, which was in excess of $2500.00. Because the shipper and carrier decided to ship with a flat fee, rather than a tariff rate related to the value of the item shipped, the court held that the carrier's liability for the lost shipment was not limited by its limitation-of-liability provisions found in its tariff or its bills of lading.

Purolator claims that because the factual situation there was more a barter arrangement than the traditional shipper/carrier relationship, that the court's legal discussion and conclusions should be disregarded. I disagree. The *Polyplastics* court's analysis of the difference between the tariff rate and a flat contract amount and its impact on a shipper's ability to choose between different rates is persuasive in this context as well, regardless of the unique set of facts to which that analysis was directed.

Purolator's allegation that FNB did have the option of choosing different rates, since the rate it ultimately "elected" to be charged—a flat amount—was lower than the tariff rates, has no evidentiary support. Nowhere in the record of this case is there any evidence as to how the flat rate was negotiated and decided upon, how it related to the tariff rates, or how it would have changed had FNB declared a greater value on Purolator's bills of lading. Purolator's

argument concerning election of rates was rejected earlier, and its averments in this motion that FNB was paying discounted rates compared to the tariff rates has no basis in the record. It is Purolator which has the burden of proving that its liability is limited. *See Carmana Designs Ltd. v. North American Van Lines Inc.*, 943 F.2d 316, 319 (3d Cir.1991). After reviewing my decision, upon Purolator's request, I reaffirm my earlier conclusion that Purolator has not carried that burden.